# IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION
## AT JACKSON

_____

|  |  |  |
|---|---|---|
| **LESS, GETZ & LIPMAN, P.L.L.C.**, | ) | Shelby County Circuit Court |
|  | ) | No. 69930 T.D. |
| Plaintiff/Appellee. | ) |  |
|  | ) |  |
| VS. | ) | C.A. No. 02A01-9706-CV-00124 |
|  | ) |  |
| **RAINBOW ENTERTAINMENT, INC.**, | ) |  |
|  | ) |  |
| Defendant/Appellant. | ) |  |
|  | ) |  |

**FILED**

**March 10, 1998**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

_____

From the Circuit Court of Shelby County at Memphis.
**Honorable Janice M. Holder, Judge**


**Melinda Plass Jewell**,
RICE, SMITH, BURSI, VEAZEY, AMUNDSEN & JEWELL, L.L.P.C., Memphis, Tennessee
**Richard M. Greene**, Greensboro, North Carolina
Attorneys for Defendant/Appellant.


**Scott A. Frick**, Memphis, Tennessee
**Michael D. Herrin**, Memphis, Tennessee
Attorneys for Plaintiff/Appellee.


OPINION FILED:

**AFFIRMED AND REMANDED**


**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**LILLARD, J.**: (Concurs)

The parties to this case dispute whether the Appellant Rainbow Entertainment, Inc., (hereinafter, "Rainbow") is obligated to the law firm of Less, Getz & Lipman, P.L.L.C., (hereinafter, "law firm") for payment for certain legal services[1]. The trial court, sitting without a jury, determined that Rainbow was indebted to the law firm for $237,193.04 for legal services rendered by the firm on behalf of Rainbow. For the reasons hereinafter set forth, the judgment of the trial court is affirmed.

## FACTS

On April 27, 1993, Rainbow Entertainment, Inc., was incorporated in the State of Mississippi to construct, develop, operate and manage a casino complex to be developed in Greenville, Mississippi. Charles Cato, one of the incorporators, hired the law firm to perform legal services on behalf of Rainbow.

On July 30, 1993, various parties entered into a Stock Distribution Agreement. The signatories to the agreement included Charles Cato, Marvin Cato, Sean Carothers, Oscar Thomas Marshall, IV, and the law firm's partners, Michael Less, Joseph Getz and Clifton Lipman. The Stock Distribution Agreement expressly provided that, at a time agreed to in the future by any four of the signatories to the agreement, Rainbow would issue a total of eight percent (8%) of its common stock to Michael Less, Joseph Getz and Clifton Lipman. Paragraph 6 of the agreement expressly stated:

> In lieu of any payment not otherwise herein set forth in this distribution agreement for capital stock, the Corporation and Principals have agreed that the price and consideration for each share of capital stock and each share of capital stock to be issued to each Principal in the proportions set forth herein in paragraph two of this Agreement are for the services rendered to or on behalf of the Corporation and the skills and efforts each Principal has devoted to the growth, development and success of the Corporation.

In order to finance the project, Rainbow entered into negotiations with Sam Chang

---

[1] Throughout the transactions underlying this lawsuit, Less, Getz & Lipman operated as a partnership known as "Less, Getz & Lipman, a Tennessee Partnership." In fact, the partnership initiated the prior lawsuit against Sam Chang and Orient Hotel Group. However, it is evident that prior to the initiation of the instant lawsuit, Less, Getz & Lipman incorporated as a Professional Limited Liability Corporation known as "Less, Getz & Lipman, P.L.L.C."

and the Orient Hotel Group in the Summer of 1994. Chang agreed to acquire a majority interest in Rainbow in exchange for providing the necessary financing. The negotiations culminated in a letter of intent dated July 25, 1994, and a first addendum dated October 12, 1994. Rainbow asserts that the aforementioned documents released it from any liability to pay the law firm for its legal services. Under the terms of the letter of intent and addendum, Chang agreed to pay the sum of $173,233.23 to the law firm for legal fees and expenses accrued by Rainbow. Also the law firm's partners agreed to reduce their total equity share in Rainbow from eight percent (8%) to four percent (4%).

Rainbow maintained that, under the letter of intent and addendum, the law firm agreed to waive any and all rights in conflict with the letter of intent in consideration for Chang's agreement to pay all of Rainbow's costs and expenses incurred through July 25, 1994. Rainbow asserts that paragraph 12 of the July 25 letter of intent specifically released "all parties" from any and all claims arising out of, connected with or related to Rainbow and its casino project. That paragraph stated:

> 12. All parties hereto, its shareholders, officers and agents, shall each release each and every other party hereto, its shareholders, officers and agents, from any and all claims and liabilities arising out of, connected with or related to Rainbow Entertainment, Inc. and Pot-O-Gold Casino except as to any warranties, indemnities and disclosures specifically made or agreed to as a condition of this sale.

Rainbow argued that, when read together, the July 25 letter of intent and October 12 addendum operated to release Rainbow from liability to the law firm. The letter of intent provided that the fee was to be paid by Chang upon the closing of the purchase; however, the law firm asserted that the letter of intent and addendum did not serve as a release of legal fees which were set forth in the document and which were to be paid at closing.

The law firm filed a separate lawsuit against Chang for breach of the letters of intent and the addendum and recovered a judgment for $200,378.46. The law firm has acknowledged that any recovery against Chang is to be credited against the amount owed by Rainbow; however, the law firm maintains that such credit does not release Rainbow of its obligation to pay legal fees.

On May 17, 1995, the law firm filed its complaint against Rainbow seeking to recover the legal fees in question. The trial court entered a judgment in favor of the law firm for $237,193.04 plus prejudgment interest at 7% per annum from May 17, 1995, through the date of entry of the order.

## ISSUES

On appeal, Appellant has raised the following issues:

I.  Whether the trial court erred in awarding damages to the law firm when it had been issued stock in Rainbow for legal services to be rendered to Rainbow.

II.  Whether the trial court erred in not finding that any obligation on the part of Rainbow to pay the law firm's fees was terminated when the parties entered into a subsequent agreement.

III.  Whether the trial court erred in refusing to grant Rainbow's motion to amend its answer to conform to the evidence introduced at trial.

In cases tried to the Court without a jury, the appeal is *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Rule 13(d) T.R.A.P. Unless the preponderance of evidence does not support the findings of fact, the trial court's decision must be affirmed absent an error of law. *Varley v. Varley*, 934 S.W.2d 659, 667 (Tenn. App. 1996); *Beacon Hill Property Owners Assoc., Inc. v. Palmer Properties, Inc.*, 911 S.W.2d 736, 737 (Tenn. App. 1995). Review of questions of law is likewise *de novo* but with no presumption of correctness. *City of Tullahoma v. Bedford County*, 938 S.W.2d 408, 412 (Tenn. 1997).

## STOCK DISTRIBUTION AGREEMENT

The crux of the appeal is whether the law firm offered its legal services as consideration for the shares of stock issued pursuant to the July 30, 1993, Stock Distribution Agreement. Rainbow has asserted that the stock was issued to Michael Less, Joseph Getz and Clifton Lipman in consideration for their providing legal services to Rainbow. Therefore, Rainbow

asserts that the law firm should not be awarded both fees and shares of stock, because to do so would compensate the law firm twice for its services. The trial court found and we agree that the Stock Distribution Agreement did not contemplate the exchange of legal fees for the issuance of stock.

Rainbow was incorporated on April 27, 1993. On July 30, 1993, the principals entered into the Stock Distribution Agreement. Under the terms of the agreement, Marvin and/or Charles Cato were to receive seventy percent (70%) of the stock; Sean Carothers was to receive twelve percent (12%), Oscar Thomas Marshall, IV was to receive ten percent (10%); Joseph Getz was to receive four percent (4%) and Clifton Lipman and Michael Less were each to receive two percent (2%) of the outstanding stock. Paragraph 6 of the Stock Distribution Agreement expressly stated:

> 6. In lieu of any payment not otherwise herein set forth in this distribution agreement for capital stock, the Corporation and Principals have agreed that the price and consideration for each share of capital stock and each share of capital stock to be issued to each Principal in the proportions set forth herein in paragraph two of this Agreement are for the services rendered to or on behalf of the Corporation and the skills and efforts each Principal has devoted to the growth, development and success of the Corporation.

It appears to the Court that the Stock Distribution Agreement was negotiated by Clifton Lipman and Charles Cato, and Charles Cato acted as agent for Marvin Cato. Lipman testified that paragraph 6 was inserted as a recital of consideration for legal purposes. According to Lipman's testimony, he provided services other than legal services in consideration for the stock. On cross-examination, Lipman testified:

> Q. What services were you providing for Rainbow other than legal services?
>
> A. Well, I provided certain business service just out of my background and experience, but I don't believe any particular services were actually contemplated. I believe that to be a paragraph setting out legal consideration.
>
> . . . .
>
> A. . . . . There were no legal services given as consideration for stock. That was not contemplated. It did not occur. This is a paragraph. It doesn't just refer to the stock of Less, Getz & Lipman; it refers to all shareholders' stock.

. . . .

And it was the same arrangement for all. No one was providing services for stock in their professional services . . .

. . . .

Q. And it's your testimony that this shareholders['] agreement had nothing to do with your legal services.

. . . .

A. I prepared the shareholders['] agreement to show the distribution of the shares of stock in the corporation. The stock is not tied to my providing or my firm's providing of any services . . .

Lipman also testified on direct examination that the shareholders reached an agreement among themselves concerning payment for professional services to be rendered, and that the parties had agreed that the law firm would bill for its services but would not seek payment until Rainbow generated a profit. Specifically, Lipman testified:

Q. And was an agreement reached between Rainbow Entertainment, Inc., and the firm of Less, Getz & Lipman concerning the rendering of legal services by Less, Getz & Lipman on behalf of Rainbow?

A. Yes. That was from the very first in conversations with Charles Cato who was the entity that was involved, the person that was involved rather than Marvin Cato at that time, myself, Joe Getz who is one of my partners. I believe Tom Marshall who has an architectural firm and Shawn Carothers of Carothers Construction Company all met together.

We entered into an shareholders agreement. We had discussions, and it was clear that we would bill our services --

MR. GREEN: Objection to what is clear, Your Honor.

THE COURT: Objection overruled.

. . . .

THE COURT: You may proceed.

A. That we would bill our services on a monthly basis, and we would be paid at such time as the entity became a going concern.

We were -- as all the people I mentioned were -- we had stock in the corporation, founder's stock, and that was because we were founders and because we were foregoing payment until such time that the entity would be established and producing a profit and also the risk of it never achieving that status and us never obtaining any repayment of our bill.

Q. As you and the other attorneys and the firm worked on this business venture, how was the time or the -- how were the services documented relative to legal services being provided?

A. In the same manner I document all of my bills to all of my clients. I made out time sheets on everything that occurred. The vast majority of my time was spent directly responding to Charles Cato, his requests to perform services, telephone conferences with him about various matters having to do with services, and my talking with or dealing with other parties at Mr. Cato's direction.

I made out time sheets daily as I do on all clients. They went into our billing department. Our billing department transcribed those individual time tickets onto a billing, and a bill was prepared monthly.

Likewise, Joseph T. Getz, a partner in the law firm, testified that the services referred to in paragraph 6 of the Stock Distribution Agreement did not refer to legal services. He testified as follows:

Q. What services did you or your firm render to the company?

A. There were a number of services, I think was the underlying consideration of this agreement, part and parcel of which was our skill and expertise that we brought to the table that a lot of practicing attorneys in Memphis just don't have.

There's not a lot of -- certainly at that time there wasn't a lot of casino work going on in Memphis. And we provided a number of services that weren't included in what was billed as well.

Q. What skill and expertise are you referring to?

. . . .

A. We have been construction counsel for Harrah's and Harrah's Entertainment and Promise Hotels which has significant casino interest as you may be aware.

And I along with Mr. Marshall also did some work for the entities that were involved in Splash Casino, and Mr. Marshall had done a lot of work for various casino interests in Mississippi as part of our architectural practice. So we had a lot of expertise in that area that a typical practicing lawyer in Memphis at that time just wouldn't have.

Q. So this is expertise as an attorney you had in the gaming industry?

A. That's correct

Q. And that was helpful to the company, Rainbow, in pursuing its goal?

A.  I'm sure it was.

. . . .

Q.  At the time that that agreement was being negotiated and being executed, if you would, tell the Court what agreements that were made as far as what compensation the firm of Less, Getz & Lipman would receive for rendering legal services to Rainbow Entertainment, Incorporated.

A.  Our agreement was and always has been and still is that we were to be paid our hourly rates, services rendered for the benefit of the corporation as well as receive an equity interest in the corporation in terms of stock.[2]

The only testimony offered by Rainbow was that of Marvin Cato who testified that he was not present at the negotiation of the Stock Distribution Agreement.  Specifically, he stated:

Q.  Mr. Cato, I believe that you testified that you were not involved with the negotiations concerning the language of the stock distribution agreement dated July 1993?

A.  I am not aware.  I don't remember if I was, but I don't recall ever being asked about it or having any input into it.

. . . .

Q.  If I understand your testimony correctly, you did not have any input relative to this paragraph 6 that you read earlier?

A.  Paragraph 6 of what?

Q.  Paragraph 6 of the stock distribution agreement.

A.  No.  I did not have any input in it.  I got this after it was already --

Q.  So you're not qualified to say any -- offer an interpretation of what that means because you weren't involved in the negotiation of that paragraph.

A.  Only what it says on paper.

Marvin and Charles Cato had been clients of the law firm for over five years, and they were familiar with the firm's rates and billing procedures.  The law firm kept meticulous time records and prepared monthly statements which were kept at the law firm's offices because it was also Rainbow's legal address.  The law firm presented unrefuted testimony that there had been

_____

[2]No issue is raised on appeal as to whether the testimony of Lipman and Getz violated the parol evidence rule, therefore we have not addressed it.

numerous conversations between Lipman and Charles Cato regarding the amount of the bill. The trial court further found that budgets and forecasts which included accumulated attorneys' fees were prepared from time to time when the principals were attempting to find funding. In further support of its claim that it was to be paid for its legal services, the law firm submitted into evidence a letter dated February 1, 1994, which was written before negotiations began with Chang. The letter states that it was issued in response to Charles Cato's request for a summary of the law firm's bill for services rendered on behalf of Rainbow. In determining the parties' intent, courts may look to the course of conduct between the parties. *In re Estate of Espey*, 729 S.W.2d 99, 102 (Tenn. App. 1986).

In light of the foregoing evidence submitted at trial, we conclude that the preponderance of evidence is in favor of the trial court's finding that the Stock Distribution Agreement did not contemplate the exchange of legal services for the issuance of stock. The services which were rendered at the time of execution of the agreement included the use of skill and expertise in casino development and gaming which is consistent with the evidence presented in the record. Accordingly, we conclude that the trial court did not err in its finding.

## LETTER OF INTENT AND ADDENDUM

As its second argument, Rainbow asserted that its agreement with Sam Chang as memorialized in the July 25, 1994, letter of intent and the first addendum of October 12, 1994, released Rainbow from its obligation to pay legal fees. Sam Chang, Marvin Cato, Sean Carothers, Michael Less, Joseph Getz, Clifton Lipman and O.T. Marshall were the signatories of the July 25, 1994, letter of intent. That letter of intent contained the following pertinent provisions:

> 2. Purchaser shall pay all of Rainbow's costs and expenses which are incurred and unpaid through July 25, 1994, as are hereafter more fully set out. Purchaser shall also fund or cause to be funded the development of the casino project in a commercially reasonable manner. Rainbow and/or its shareholders shall transfer or cause to be issued 83% of Rainbow's common stock to Purchaser and all

shareholders and signatories to this Agreement hereby waive any and all rights which are or may be in conflict with this Agreement and shall execute all documents necessary to achieve and facilitate the purposes of this Agreement.

. . . .

### 6. **LESS GETZ & LIPMAN ("LGL")**
(a) LGL shall be paid $160,000.00 at the closing described in Section 3(a) hereof for its fees, costs and expenses billed to Rainbow; and

(b) Less, Getz & Lipman shall be issued or shall retain a total of four percent (4%) of Rainbow's common stock.

. . . .

12. All parties hereto, its shareholders, officers and agents, shall each release each and every other party hereto, its shareholders, officers and agents, from any and all claims and liabilities arising out of, connected with or related to Rainbow Entertainment, Inc. and Pot-O-Gold Casino except as to any warranties, indemnities and disclosures specifically made or agreed to as a condition of this sale.

13. Upon acceptance of this offer, Purchaser will assume all costs and expenses of Rainbow including but not limited to . . . legal costs and fees . . . .

All of the aforementioned signatories to the July 25 letter of intent also entered into a "First Addendum" dated October 12, 1994. That document contained the following pertinent provisions:

1. Rainbow Entertainment, Inc. ("Rainbow"), its shareholders and Sam Chang, individually, have entered into a Letter of Intent with the effective date of July 25, 1994.

. . . .

8. The sums owed to Less, Getz & Lipman in accordance with paragraphs 6(a) and 6(b) of the Letter of Intent of July 25, 1994, shall be increased from $160,000.000 to $173,233.23.

. . . .

12. This addendum to the Letter of Intent of July 25, 1994, shall supersede and replace all provisions of the Letter of Intent of July 25, 1994, which may be different from or in conflict with this addendum. All provisions of the Letter of Intent of July 25, 1994, which are not modified, deleted or changed by this addendum shall remain in full force and effect as originally written.

Rainbow asserts that any obligation on its part to pay legal fees was extinguished by

the release contained in paragraph 12 of the July 25 letter of intent. According to Rainbow, that provision releases it, as a party to the agreement, from further obligation to pay the law firm's legal fees. Furthermore, Rainbow asserts that the release in question was to be effective immediately and was not to be contingent upon Chang's payment of the legal fees at issue.

In response, the law firm asserts that Rainbow was not a party to the letter of intent or addendum. We disagree. Rainbow's individual shareholders were the signatories to the letter of intent and addendum, and the release provision at issue here expressly states, "[a]ll parties hereto, its shareholders, officers and agents." The common bond among the shareholders was their ownership of Rainbow, and Rainbow is implicitly referred to as a party to the letter of intent. Furthermore, it is apparent that the shareholders in the October 12 addendum ratified the letter of intent to expressly include Rainbow Entertainment, Inc., as proved by Paragraph 1 of that document.

However, it appears to the Court that the law firm's release of Rainbow was conditioned upon Chang's purchase of Rainbow and the payment of the outstanding legal fees. Examination of the letter of intent and addendum reveals that both documents are focused upon the ultimate purchase of Rainbow by Chang. Therefore, it appears that the parties conditioned the occurrence of certain transactions such as the release upon the purchase. The letter of intent contains numerous statements such as "shall pay", "shall receive" and "upon acceptance of this offer" which indicate to this Court that the occurrence of some future event is a condition to the release. Paragraph 13 of the letter of intent specifically states:

> 13. Upon acceptance of this offer, Purchaser will assume all costs and expenses of Rainbow including but not limited to . . . legal costs and fees . . . . (Emphasis added.)

Similarly, Paragraph 12 of the letter of intent states in pertinent part:

> All parties hereto, its shareholders, officers and agents, shall each release each and every other party hereto . . . . (Emphasis added.)

Chang never completed the purchase of Rainbow, and the legal fees were never paid;

therefore, the condition that was to have been met in order to release Rainbow of its obligations was not performed. While it is undisputed that Chang agreed to pay Rainbow's legal fees, we decline to find that Chang's agreement released Rainbow from its obligations.

**MOTION TO AMEND ANSWER**

Following the trial, Rainbow filed on September 3, 1996, a motion to amend its answer to conform to the evidence. The trial court denied the motion at the November 21, 1996, hearing. Appellant asserts that the trial court erred by denying the motion to amend.

The review of questions of law is *de novo* with no presumption of correctness. *City of Tullahoma v. Bedford County*, 938 S.W.2d 408, 412 (Tenn. 1997). The denial of a motion to amend is within the discretion of the trial court, and the trial court's decision will not be disturbed absent a showing of abuse of its discretion. *Hall v. Shelby County Retirement Board,* 922 S.W.2d 543, 546 (Tenn. App. 1995). Tenn.R.Civ.P., Rule 15.01 provides:

> A party may amend the party's pleadings once as a matter of course at any time before a responsive pleading is served . . . . Otherwise, a party may amend the party's pleadings only by written consent of the adverse party or by leave of court . . . .

After a responsive pleading has been served, the denial of a motion to amend the pleadings lies within the sound discretion of the trial court. *Welch v. Thuan*, 882 S.W.2d 792, 793 (Tenn. App. 1994); *Merriman v. Smith*, 599 S.W.2d 548, 559 (Tenn. App. 1979). As noted by this Court in *Merriman*, a trial judge should consider such factors as undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment. *Merriman*, 599 S.W.2d at 559.

In denying the motion, the trial court stated:

THE COURT: It wouldn't matter if I amended it or not, this

would still be the ruling. I pretty much considered it all, because it was a bench trial, and I consider all of the evidence, so whether I formally allow your amendment or not, my inclination would probably be not to formally allow it, because there were objections made all the way along to what was going in, and this is -- a motion to amend to conform to the evidence is generally made at the conclusion whether or not objections were made and the issues were tried by the consent of the parties. And I don't know that I could really find in this case all the issues were tried by the consent of the parties; Mr. Frick was jumping up and down on a regular basis. So I'm going to -- I guess I will save you -- I will deny your motion to amend, but by the same token I have heard all of the evidence, I have read the transcript over a couple of times. I have taken it all into consideration. Were I to grant your amendment, the ruling would be no different.

While the trial court denied the motion to amend, the court clearly and unequivocally stated that it had considered all the evidence presented. The Court concluded its remarks by stating that even if it were to grant the amendment, the outcome of the case would be no different. Upon consideration of the foregoing, this Court is of the opinion that the trial court did not abuse its discretion in denying Rainbow's motion to amend the answer.

_____
FARMER, J.

_____
CRAWFORD, P.J., W.S. (Concurs)

_____
LILLARD, J. (Concurs)